In re the Marriage of George J. LYON, Petitioner, Appellant,

v.

Mary Jean LYON, Respondent.

No. C8-87-2148.

Supreme Court of Minnesota.

May 5, 1989.

Ronald L. Simon, P.A., Minneapolis, for appellant.

Kathleen M. Picotte–Newman, Jack F. Daly, Larkin, Hoffman, Daly & Lindgren, Minneapolis, for respondent.

SIMONETT, Justice.

This marriage dissolution appeal questions the valuation of several marital assets and an award of spousal maintenance. We reverse and remand as to maintenance and affirm on the other issues.

The parties in this case had a traditional marriage of 32 years, the husband pursuing a business career and the wife engaged as a homemaker. Their seven children are now adults. The divorce decree under re-

view here was entered in 1987, when the husband was 58 and the wife was 57.

The trial court divided the marital property equally, each spouse receiving approximately $3.6 million. Among the marital assets distributed to the husband were his stock interest in a closely-held corporation and certain tax-shelter investments. The husband claimed the trial court valued the stock without taking into account that it was subject to a shareholders' buy-sell agreement. He claimed also that the tax shelters had no ascertainable value and should have been distributed in-kind. Further, he claimed the trial court should not have awarded the wife $40,000 attorney fees when she was well able to pay her own litigation expense. Finally, claiming that the wife had made no showing of need, the husband objected to paying permanent spousal maintenance of $4,000 a month.

In an unpublished opinion, the court of appeals affirmed the trial court's decision. We granted the husband's petition for further review.

### I.

■ The husband is an officer and one of five shareholders in a securities investment firm; he owns a 21.7–percent stock interest, subject to a buy-sell agreement executed by the shareholders some years before the parties separated in 1984. Under this agreement, if a shareholder is terminated or becomes disabled, the shareholder must sell his stock to the corporation at book value and the corporation must buy it; if a shareholder desires to dispose of his stock during his lifetime, the corporation or the remaining shareholders have the first right to purchase the stock at book value. Evidence at the trial established that it was the practice of the corporation not to retain earnings but to distribute profits annually; that the book value of the husband's stock was $374,392; and that the fair market value of the stock, absent the buy-sell restriction, was $650,000. The trial court valued the stock at $475,000.

We have said that while a buy-sell agreement is not dispositive on value, the valuation of the stock "should in some way

reflect the unique contingencies" of the transfer restrictions. *Rogers v. Rogers,* 296 N.W.2d 849, 852 (Minn.1980). In *Rogers* the husband owned 85 percent of the company's stock, and, as we there noted, might well have been able to influence the other shareholder to modify the transfer restrictions. In this case, the husband points out he owns only a 21.7–percent interest, arguably not enough to exert any appreciable influence to obtain a change in the agreement.

The possibility of a modification of the buy-sell agreement among the business partners, if they choose to be amenable, cannot be completely discounted. Indeed, under the terms of the shareholders' agreement, even unmodified, the remaining shareholders could choose to allow a sale to an outsider to go through above book value. Here, too, the husband wanted the stock and got it; for him, the stock affords a corporate base from which to continue to operate as a successful securities dealer. In fact, the trial court did not ignore the buy-sell agreement in this case, but decreased the unrestricted fair market value substantially more than it increased the book value to arrive at a valuation for purposes of the marriage dissolution. We cannot say that a figure of $475,000 was not within the trial court's discretion.

■ The husband also had a limited partnership interest in an Apache–Shell offshore oil venture. At the time of trial he had paid in $66,666 and was obligated over the next 5 years to increase his investment to a total of $200,000. Because of the wildly fluctuating price of oil, the husband testified he was unable to estimate the value of the investment at the time of the divorce. The trial court put the value at $66,666 and gave the property to the husband. In *Nardini v. Nardini,* 414 N.W.2d 184, 188 (Minn.1987), we noted that in dividing a marital estate, "[i]f the asset is readily divisible, the court can divide the asset and order just and equitable distribution in kind." The husband argues there should be an in-kind distribution here. But considering the unpaid obligation remaining, it does not seem the Apache–Shell investment

is "readily divisible." The trial court also may have thought that the husband, an expert securities dealer, might have shown a little more enthusiasm in attempting to place some range of value on the investment. Under the circumstances, we cannot say that the trial court did not use appropriate discretionary judgment in valuing the investment at the amount that the husband had paid into it.

■ Valuation of tax-shelter investments, where the value may depend on tax consequences affecting income on other investments in the owner's portfolio, is difficult. *See Pekarek v. Pekarek*, 362 N.W.2d 394, 397 (Minn.App.1985). This is again illustrated by the limited partnership units in Dyco Petroleum. From 1982 through 1986, the husband made nine purchases of Dyco (five units per purchase) at $25,000 a transaction. Dyco fixed the "repurchase" value of the first eight purchases at the time of trial from $1435 to $6465, and the trial court adopted these depressed figures. The wife was given the first seven purchases (which were already in her name) and the husband the last two (which were in his name). The last Dyco $25,000 purchase in 1986 was not capable, however, of being valued by Dyco at the time of trial because, so it was explained, "it had been purchased too recently." The trial court set the value at $25,000, the purchase price, and awarded this last investment to the husband. The husband argues this last purchase should have been divided in-kind. In view of the history of the other Dyco purchases, it seems likely the 1986 investment would have plummeted in value from its purchase price too; nevertheless, the husband had chosen to make the purchase while the divorce action was pending with a property distribution imminent, and he apparently thought the investment was worth the $25,000 he paid for it. While we are not comfortable with the court's valuation, considering no other figure was proposed, we cannot say the trial court's judgment was an abuse of discretion.

■ Finally, the husband objects to paying $40,000 of his wife's attorney fees. The objection is not so much to the amount but to the fact that the wife is well able to pay her own fees. In this case, considering the size of the marital estate and its equal division, the trial court might have left the parties to pay their own attorneys. Nevertheless, in trying to divide the estate equitably, the court had to make many adjustments and calculations, and we cannot say that the trial court, in the exercise of its good judgment, could not have factored in the attorney fee award to the wife. It appears, too, the trial court may have thought the wife had been put to more legal skirmishing and more discovery work than was necessary. The referee who tried this case was an experienced retired trial judge, and we rely on his appraisal of the many facets of this case.

## II.

We now reach the most troublesome issue, the maintenance award. The trial court found the wife's monthly living expenses to be $6500. This finding is not challenged. Because of the wife's age, precarious health, and absence from the labor market over many years of a traditional marriage, the parties agree the wife is unemployable. The husband further agrees that the wife should not have to invade the principal of her estate to meet her living expenses. The husband concedes he is able to pay $4000 a month maintenance. Nevertheless, the husband contends he should not have to pay permanent spousal maintenance because the wife's income from her share of the marital property is more than adequate for her to maintain the standard of living she had achieved in the marriage.

■ Since the divorce, pursuant to agreement, the parties have sold their home for $1.2 million and the wife, with her half of the sale proceeds, has purchased another home which she owns free and clear. From her share of stocks, bonds, mutual funds, and obligations owed her,[1]

---

1. Under the divorce decree, in order to equalize the property distribution, the husband is obligated to pay the wife $949,544.20 by July 1, 1990, payable in monthly installments with 8–percent interest, and a balloon payment. The wife points out this obligation will be paid in 1990.

the wife will have an income of approximately $185,000. In addition, the wife has received a profit-sharing account and IRA's totaling $405,693 which, if she chooses, will be available to her in May 1989; at 8–percent interest, this sum would return about $32,000 a year. It appears, then, that the wife's $3.6 million estate, less nonliquid assets, will produce conservatively over $200,000 a year income. Even allowing for income taxes, the wife's net income will comfortably exceed her living expenses of $78,000 a year.[2]

Minn.Stat. § 518.552, subd. 1 (1988), says that spousal maintenance "may" be awarded if the spouse seeking maintenance (a) "lacks sufficient property, including marital property apportioned to the spouse, to provide for reasonable needs * * *," *or* (b) "is unable to provide adequate self-support * * * through appropriate employment * * *." The wife concedes she does not meet the first threshold requirement but points out that the second requirement is in the disjunctive,[3] and, because she is unemployable, she qualifies under that threshold. In our view, a spouse lacking income through self-employment is not by that fact alone necessarily entitled to maintenance.

Because maintenance is awarded to meet need, maintenance depends on a showing of need. *See Sefkow v. Sefkow,* 427 N.W.2d 203, 216 (Minn.1988). This dependence on need is implicit in the second threshold requirement dealing with unemployability of the spouse seeking maintenance. Indeed, what is implicit becomes

explicit when the statute goes on to state that, in awarding maintenance, the factors to be considered include "the financial resources of the party seeking maintenance, including marital property apportioned to the party, and the party's ability to meet needs independently * * *." Minn.Stat. § 518.552, subd. 2(a) (1988).

The wife in this case points out that the husband earns a substantial salary, $305,000 in 1986, and she seems to argue that she should share in this earning capacity. A spouse's ability to pay maintenance does not, however, obviate the statutory mandate that the other spouse's own independent financial resources must be considered too. This case is not like, say, *DeLa Rosa v. DeLa Rosa,* 309 N.W.2d 755 (Minn.1981). There a spouse in a short-term marriage, who had contributed financially to her husband's professional education, was permitted to share in the husband's future earning capacity; she was given an "equitable award," which this court was careful to say was not maintenance. *Id.* at 758. Here, by stark contrast, there has been an equal division of a substantial marital estate amassed over 32 years which enables the wife to continue her established high standard of living.

We hold, therefore, that the award of spousal maintenance must be reversed. Having said this, we think it pertinent to observe this case is an anomaly. It is not often there is a marital estate of $7.2 million. It is unusual for the spouse seeking maintenance to receive $3.6 million on which to live. The more typical case, we

But in 1990 the wife will have the $949,544.20 and, assuming she invests the principal as it is repaid, her interest income of approximately $75,000 a year on that sum will continue.

2. The court's amended findings state: "It would be inequitable to require Respondent to invade her share of the marital assets to meet her monthly living expenses. However, her share of the marital estate will produce substantive [sic] income." To the extent this finding might be construed as determining that the wife would have to invade her estate, it is clearly erroneous.

The wife argues that the husband presented no evidence at trial of what her income would be, while the husband counters he could not have known until after the court had divided the assets. Both arguments are a little disingen-

uous. In any event, once the court divides the income-generating assets, the post-trial motion for amended findings and conclusions of law is ideally suited for calling the trial court's attention to any issues which may have re-emerged in sharper profile because of the finally stabilized facts. Here the husband made appropriate post-trial motions.

3. Prior to 1985, Minn.Stat. § 518.552, subd. 1, read that the court may grant maintenance if the spouse lacks sufficient property *and* lacks self-support through employment. The 1985 amendments changed "and" to "or." *See* Act of May 31, 1985, ch. 266, § 2, 1985 Minn.Laws 1186.

suspect, is like *Nardini*, where the spouse of a traditional long-term marriage with a much more moderate marital estate was awarded permanent spousal maintenance.

Arguably, on this record, the reversal of maintenance should be final. Nevertheless, mindful of the broad discretion afforded a trial court in these matters, we hesitate to divest the court of jurisdiction over spousal maintenance in this unique instance. We remand, therefore, to the trial court to amend the divorce decree to delete the maintenance award but to provide for the maintenance issue to remain under the court's jurisdiction. The parties will pay their own attorney fees and costs in this appeal.

Affirmed in part, reversed in part, and remanded.