*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1841**

In re the Marriage of: Christine J. Curtis, petitioner,
Appellant,

vs.

Gregory M. Curtis,
Respondent.

**Filed June 22, 2015
Affirmed
Connolly, Judge
Dissenting, Kirk, Judge**

Brown County District Court
File No. 08-FA-12-933

Andrew M. Tatge, Abbie S. Olson, Gislason & Hunter, LLP, Mankato, Minnesota (for appellant)

Roger H. Hippert, Nierengarten & Hippert, Ltd., New Ulm, Minnesota (for respondent)

Considered and decided by Connolly, Presiding Judge; Kirk, Judge; and Stoneburner, Judge.[*]

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**CONNOLLY**, Judge

Appellant challenges the denial of a spousal-maintenance award, arguing that the district court abused its discretion by attributing an excessive amount of income to her and requiring her to liquidate her property award to meet her expenses. Because we see no abuse of discretion in the district court's decision, we affirm.

## FACTS

Appellant Christine Curtis and respondent Gregory Curtis were married in 1990. Their daughter is now emancipated; their son is 16. During the marriage respondent worked as a dentist; he also managed the parties' investments.

The parties separated in 2012 or 2013. The issue of spousal maintenance was tried to the district court. The dissolution judgment awarded the homestead and investments totaling $2,209,399, or 57% of the marital estate, to appellant, and the remaining 43% to respondent. The judgment provided in relevant part that, by reallocating the investments appellant was awarded from growth funds to income-producing funds, appellant could meet her reasonable monthly expenses and denied spousal maintenance for that reason. Appellant argues that requiring her to reallocate the investments to produce income to meet her expenses was an abuse of discretion.

## DECISION

A district court's decision on spousal maintenance is reviewed for an abuse of discretion. *Dobrin v. Dobrin*, 569 N.W.2d 199, 202 (Minn. 1997). An abuse of

discretion occurs if findings of fact are unsupported by the record or the law is improperly applied. *Id*.

Factors to be considered in awarding maintenance include "the financial resources of the party seeking maintenance, including marital property apportioned to the party, and the party's ability to meet needs independently . . . ." Minn. Stat. § 518.552, subd. 2(a) (2014). This statute "requires the courts to consider financial resources, which include income generated by liquid assets." *Fink v. Fink*, 366 N.W.2d 340, 342 (Minn. App. 1985). Appellant provides no support for her view that the district court cannot consider the full income potential of investments awarded to a spouse in determining the spouse's need for spousal maintenance.

The district court found that:

> 78. [Appellant's] most substantial asset available for investment is an Ameritrade account valued at $2,038,492.25.
> 79. [Appellant's] total funds available for investment are $2,209,399.22.
> . . . .
> 84. As a result of [respondent's] growth-focused investment strategy, the Ameritrade account is returning just 1.7 percent annually.
> 85. . . . [Respondent's financial expert] testified regarding income that [appellant] could expect to earn from the Ameritrade account if the funds were invested in a combination of two (2) mutual funds.
> 86. [Respondent's expert] testified that $2,100,000 invested in these funds in 1993, with $6,100 withdrawn per month, would now be worth $4,419,686.
> 87. [Respondent's expert] also presented a scenario showing that] $2,100,000 invested in 1993 with monthly withdrawals of $9,300, increasing by 3 percent annually, would have a present value of $2,180,062, roughly the original investment. This is an average annual return of 6.89 [percent], including capital gains.

. . . .

89. . . . The rates of return in [respondent's expert's] three (3) scenarios ranged from 6.98 to 7.13 percent.

90. The Court finds [respondent's expert's] testimony credible and persuasive.

. . . .

94. The Court [also] finds [appellant's expert's] testimony credible; however, he was not asked to, and did not, suggest methods to obtain the highest reasonable rate of return on [appellant's] investment assets.

95. A reasonable return on [appellant's] available investment assets is 7 percent.

Appellant does not refute these findings, including the finding that her expert did not provide any evidence to rebut respondent's expert's views on the possible rate of return if the assets were reallocated to mutual funds.

Appellant argues now, as she argued in her motion to amend, that the district court's use of what her investment income could be, instead of what it now is, was contrary to law because she cannot be required to "liquidate her assets" or "invade the principal of [her] investments." *See Bury v. Bury*, 416 N.W.2d 133, 138 (Minn. App. 1987) (spouse cannot be required to liquidate assets); *Lee v. Lee*, 775 N.W.2d 631, 640 n.10 (Minn. 2009) (spouse cannot be required to invade principal). The district court addressed appellant's argument in its memorandum when it denied her motion.

> [T]he assets awarded to [appellant], specifically her investments, can be shifted to different investments that will provide a higher yield and less growth. This is not an invasion of assets; it is a reallocation that takes into account the changed circumstances of the investor. The value of [appellant's] principal will not be reduced on a monthly basis to pay for ongoing expenses. Rather, [appellant] will have the same principal (with some tax consequences associated with the reallocation of assets) after the reallocation as before. [Her] theory is that any change in investment is an invasion of

4

the assets awarded to her. Under this theory, [she] could leave the investments in accounts where they are producing just 1.7 percent in income, rather than reinvest them in a manner that will allow her to earn a 7 percent yield, and expect [respondent] to make up the difference indefinitely.[1]

We agree.

Appellant relies on *Lyon v. Lyon*, 439 N.W.2d 18, 22 n.2 (Minn. 1989) for the proposition that a district court's finding is clearly erroneous if it could be "construed as determining that the wife would have to invade her estate." But appellant's reliance is misplaced: *Lyon* reversed a maintenance award on the ground that the husband "should not have to pay permanent spousal maintenance because the wife's income from her share of the marital property is more than adequate for her to maintain the standard of living she had achieved in the marriage." *Lyon*, 439 N.W.2d at 21-22. Although the wife was unemployable, she was found able to meet her needs independently because she received $185,000 annually from stocks and other assets and could receive an additional $32,000 from a profit-sharing account and IRAs to meet her annual needs of $78,000. *Id.* Therefore, she was not entitled to maintenance, regardless of the husband's ability to pay. *Id.* The district court's decision here cannot be construed as requiring appellant to invade her property award to meet her expenses.

---

[1] The dissent states that the tax consequence of reallocating the assets would be significant. However, the discussion of respondent's expert's three scenarios in appellant's brief does not mention tax consequences, and the district court was within its discretion in not considering the tax consequences to be dispositive. *See Maurer v. Maurer*, 623 N.W.2d 604, 608 (Minn. 2001) (noting that whether to consider the tax consequences of a property distribution lies within the district court's discretion).

Appellant also argues that the denial of spousal maintenance deprives her "of the benefits of the stipulated equitable property settlement." But the property settlement gave appellant 57% of the marital assets, of which 79% was liquid assets, because she could not support herself by her earnings and would need income from investments; respondent, who could support himself by his earnings, received the greater part of the parties' real property, which would not yield income. The parties' stipulation did not confer to a right to keep investments as they were at the time of the dissolution, and respondent testified that, over the years, his investment strategies had changed depending on the parties' situation. Respondent's financial expert testified that he had been retained to see "what can we do with a sum like [$2,100,000] in today's economic environment [so] as to get income out of it"; respondent's attorney testified that appellant had been awarded liquid assets so she could "support herself without the need to receive income from [respondent]."

Appellant's attorney's objection to testimony about appellant's potential investment income was overruled on the ground that appellant's financial expert had previously testified about what appellant would receive "on the assumption that the [$2,038,492 Ameritrade] account would be liquidated." Thus, experts for both parties realized that appellant's liquid assets would need to be reinvested to produce more income. Awarding an obligee spouse greater investment income to decrease the need for maintenance has been recognized as an appropriate strategy. *See, e.g.*, *Fink*, 366 N.W.2d at 343 (noting that "[t]he trial court might, alternatively, have made a disproportionate property settlement in [the obligee spouse's] favor so that her support would have come

6

more substantially from investment income . . . [which] in turn may potentially create less cash flow problems for [the obligor spouse]").

Finally, appellant argues that the district court abused its discretion by relying on respondent's expert's testimony. The district court found that testimony to be "credible and persuasive," and this court defers to district court credibility determinations. *Sefkow v. Sefkow*, 427 N.W.2d 203, 210 (Minn. 1988).[2] Respondent's expert pointed out that risk is inherent in any investment and the successful recent performance of the funds he recommended could not be guaranteed. Appellant provides no basis for overriding the district court's finding that respondent's expert's testimony was credible, and that finding is supported by the record and is not an abuse of discretion. *See Dobrin*, 569 N.W.2d at 202 (holding that abuse of discretion occurs if findings of fact are unsupported by the record).

Finally, appellant relies on *Flynn v. Flynn*, 402 N.W.2d 111 (Minn. App. 1987), *review denied* (Minn. Nov. 24, 1987) for the proposition that, while a district court "may rely on expert testimony regarding the likelihood of various contingencies, it cannot rely on speculation and conjecture." But the expert in *Flynn* valued one spouse's interest in his law firm on the supposition that, although the spouse had "repeatedly stated he ha[d] no plans to withdraw from the law firm and [was] likely to remain until retirement," he would nevertheless withdraw from the firm. *Flynn*, 402 N.W.2d at 117. The district

---

[2] The district court also found appellant's expert's testimony credible, but noted that, unlike respondent's expert, appellant's expert "was not asked to, and did not, suggest methods to obtain the highest reasonable rate of return on [appellant's] investment assets."

court's decision not to adopt the expert's valuation was affirmed because "[the expert's] forecast [was] speculative and based on conjecture." *Id.* Here, respondent's expert's forecasts did not contradict any expressed intention of either party.

The district court did not abuse its discretion in finding that appellant's investments would yield sufficient income to meet her needs and denying her spousal maintenance.

**Affirmed.**

**KIRK**, Judge (dissenting)

I respectfully dissent. In a long-term, high-asset, high-cash flow marriage, where one of the parties stays home by agreement of the parties, the failure to fairly and equitably divide both the marital estate and the ongoing cash flow diminishes the value of the stay-at-home party's contribution to the family partnership. I would conclude that the district court abused its discretion by denying spousal maintenance (maintenance) to appellant (wife) and would reverse and remand for further proceedings.

The district court erred in two ways. First, it failed to properly establish the pre-dissolution marital standard of living. Second, it required wife to invade principal and change investment assets that she received in the distribution of the marital estate to meet her living expenses.

It is important to place this case in context. Wife and respondent (husband) married in 1990, shortly after graduating from the University of Minnesota with respective degrees in fashion merchandising and dentistry. In 1995, after the birth of their first child, they both agreed that wife would stay at home full time to cultivate their most precious assets, their children, while husband would develop the family's financial assets. Now, 23 years later, this partnership produced two lovely children and became an economic juggernaut that created a $5 million marital estate and an ongoing cash flow of $642,213 per year ($53,518 per month).

The district court abused its discretion in concluding that wife has sufficient financial resources to meet her reasonable needs in light of the high standard of living established during the marriage. *See* Minn. Stat. § 518.552, subd. 1(a) (2014). That

conclusion ignores that part of the standard of living focused on the accumulation of savings and wealth, including such things as the development of the Ameritrade growth account, and the purchase of a lake home and vacation home. *See Johnson v. Johnson*, No. C4-87-2163, 1988 WL 36735, at \*2 (Minn. App. Apr. 26, 1988) ("Nevertheless, we believe that a couple's standard of living may well include the pleasure of saving rather than being profligate.").[1] Their standard of living also allowed them to generously provide for the present and future needs of their children, including educational accounts totaling more than a half of a million dollars. *See Chamberlain v. Chamberlain*, 615 N.W.2d 405, 410-12 (Minn. App. 2000) (affirming award of permanent maintenance based in large part upon the long-standing affluent standard of living established during the parties' marriage, despite the fact that it was beyond the parties' means, noting that the maintenance statute requires consideration of the marital standard of living), *review denied* (Minn. Oct. 25, 2000).

Based upon the parties' 2012 federal and state tax returns, the most recent available in the record, they had after-tax income of approximately $35,832 per month. This figure accurately reflects the high standard of living that this couple enjoyed during their marriage. But the district court never made findings establishing the parties' high standard of living during the marriage. The findings on wife's reasonable needs were based on the frugal post-separation expenses of a disadvantaged spouse. Her expenses of

---

[1] I find this unpublished case to be persuasive. *See Dynamic Air, Inc. v. Bloch*, 502 N.W.2d 796, 800 (Minn. App. 1993) (holding that unpublished cases from the Minnesota Court of Appeals can be of persuasive value).

$7,768 per month, as found by the district court, were about 22% of the parties' after-tax income during the marriage. This certainly does not reflect their true standard of living.

In reaching its conclusion that, due to the divorce, wife should change her investment strategy from high-growth to income-producing, the district court found that the parties initially concentrated on growing a "nest egg" that could be drawn on in future years, which have now arrived. Counsel for husband argued that this account was a rainy day fund, but, if, as suggested by counsel, this dissolution proceeding has created a major thunderstorm, why is it only raining at wife's house? At husband's house located in the same neighborhood in the same small town, the sun is shining brightly. Husband, who chose this investment strategy for the parties during the marriage, testified that it was set up for growth "through thick and thin." The district court's decision allows husband to continue to focus on preserving and growing the assets that he was awarded in the dissolution judgment while also solely benefiting from his significant earning capacity that he developed during the marriage.

The district court's plan for wife's marital assets improperly requires invasion of wife's property award and makes some unrealistic conclusions about her future potential income from a forced change in investment strategy. The plan assumes that wife's assets can consistently return seven percent if moved to "higher-yielding investments." Minnesota appellate courts have held that a spouse may not be required to liquidate assets or invade the principal of the property in order to meet living expenses. *See Lyon v. Lyon*, 439 N.W.2d 18, 22 n.2 (Minn. 1989) (stating that, to the extent the district court's finding that wife's share of the marital estate would produce substantial income could be

construed as a determination that the wife would have to invade her estate, it was clearly erroneous); *Lee v. Lee*, 775 N.W.2d 631, 640 n.10 (Minn. 2009) ("[W]hen considering the property awarded to a spouse seeking maintenance, we have looked at the income generated from that property, and not required the obligee spouse to invade the principal of the property to pay living expenses"); *Bury v. Bury*, 416 N.W.2d 133, 138 (Minn. App. 1987) (holding wife should not be required to place herself at risk by liquidating her assets in order to meet her expenses). Liquidation of wife's Ameritrade account results in a $154,527 tax bill, which is a direct invasion of principal and improperly changes the parties' stipulated equitable distribution of property. Conversion of one type of investment account into another also changes the nature of the asset, which is analogous to invading the principal or liquidating the investment.[2]

The district court should have concluded that wife satisfied the requirement of the first part of the maintenance statute, Minn. Stat. § 518.552, subd. 1 (2014), the establishment of reasonable needs to meet the parties' high standard of living, and then reached the second part of the statute, which requires the court to consider "all relevant factors." *Id.*, subd. 2 (2014). The second part of the statute enumerates several factors that take into account a stay-at-home parent's contribution during the marriage, including the length of the marriage, the parent's "length of absence from employment and the extent to which any education, skills, or experience have become outmoded and earning capacity has become permanently diminished," "the loss of earnings, seniority, retirement

---

[2] Conversion of wife's assets also requires abandonment of the investment strategy husband thought best for the family.

benefits, and other employment opportunities forgone by the spouse seeking spousal maintenance," and "the contribution of a spouse as a homemaker or in furtherance of the other party's employment or business." *Id.*, subd. 2(d), (e), (h).

The district court's reasoning implicitly relies on its finding that wife and husband received 57 percent and 43 percent of the parties' marital property, respectively. However, the parties' stipulation contains no such calculation, indicating, only, that the division of marital property was fair and equitable. True values may be different than those stated in the stipulation, for various reasons. For example, certain assets carry tax consequences if liquidated, which may diminish stated value. Intangible assets, such as goodwill and patient counts, were not included in the valuation of husband's dental practice and the attorneys acknowledged during oral argument that the value of the dental practice would have been substantially higher had intangible assets been included. The parties may have undervalued their real properties in order to avoid the creation of a public document that could result in increased assessed property values and higher tax liabilities.

In this case, wife gets her home, while husband receives his home as well as the commercial building, the lake home, and the vacation property located in Myrtle Beach, South Carolina. Although an equitable property division does not necessarily require equal distribution, some language indicating an unequal distribution would be necessary to conclude that wife received a greater share of the parties' assets. *See* Minn. Stat. § 518.58, subd. 1 (2014) (requiring the district court to make findings "on all relevant factors" supporting its just and equitable division of marital property). Even assuming

that the property distribution was unequal, there is no indication that any additional property awarded to wife was in lieu of maintenance. Without such conditioning language in the parties' stipulation, the only proper conclusion is that the parties reached a fair and equitable division of marital property.

In this economy, it is doubtful that wife could find a secure investment earning income of seven percent on a consistent basis. The current return on most traditionally safe investments, such as insurance-backed bank accounts and U.S. Treasury securities, is very little, in many cases less than one percent. Indeed, in calculating annual rates of return in the seven percent range, husband's expert included capital gains. Requiring use of capital gains to finance wife's expenses constitutes another invasion of principal. Husband's expert also testified that there are "conservative" "investments out there that get you to that 5 and 6 percent dividend yield," but acknowledged that he did not know wife's risk tolerance, long-term goals, or her life expectancy.

Wife's attorney did not present expert testimony on the financial impact of converting her high-growth account to more income-producing assets. Instead, he relied on the long-standing precedent prohibiting liquidation of a marital asset to meet post-dissolution expenses. Given the law in this area, this strategy was not unreasonable. However, in the various maintenance scenarios presented to the district court, wife's expert presented a hypothetical where the account could be liquidated and re-invested in safe funds that may return 3% rather than the 1.75% being earned by the growth account.

Both parties cite *Lyon* in support of their positions. That case differs from this case in several ways. First, the husband and wife in *Lyon* were approximately ten years

older than the husband and wife in this case, putting them much closer to retirement age. 439 N.W.2d at 19-20. Therefore, it was more appropriate to expect the parties to focus their investments on producing income, as they were approaching the stage of their lives when the husband would no longer be working. Here, husband will likely work an additional 12 or more years before retiring.

Second, the marital landscape has evolved quickly and dramatically in the 26 years since the supreme court decided *Lyon*. For example, it is now more common for either a man or a woman to be a stay-at-home parent, and, more recently, the right to marry was extended to same-sex couples who had been denied that right in the past. *Mr. and Mrs. George Lyon* were married in 1955, a time when there was no conscious decision or choice between a married couple as to who stayed at home and no belief that the wife was sacrificing a career in return for shouldering the responsibility of the development and wellbeing of their children and family. *See id.* The law must be nimble in adapting to the changing dynamic of the marital partnership in our rapidly evolving society.

Third, the share of marital assets received by the wife in *Lyon* was $3.6 million in 1987, which would be over $7.3 million in 2013 dollars.[3] *See id.* at 22. The assets as held were producing income of over $200,000 per year (over $410,000 in 2013 dollars), more than adequate to pay her expenses and maintain her high marital standard of living, and she was not expected to invade principal to pay taxes or to change the way in which

---

[3] BUREAU OF LABOR STATISTICS, UNITED STATES DEPARTMENT OF LABOR, http://www.bls.gov/data/inflation_calculator.htm (last visited June 11, 2015).

her assets were held. *See id.* at 21-22. In 1987, when their dissolution judgment was entered, extremely safe investments could return income of seven percent with no need to rely upon the Wall Street Casino.[4] *See id.* at 20. Here, even husband's expert, upon whom the district court relied, indicated that past performance of mutual funds is no guarantee of future results, and he implied that his plan would fail if there were a major financial market downturn, which occurred as recently as 2007 to 2009. In considering the past performance of particular accounts over the last 20 years, the expert ignores the reality that other accounts did not perform similarly during the same time period, and that the income produced by these accounts may fluctuate year to year. Anyone with the benefit of hindsight could come up with a winning investment account or two over the past 20 years. This is much too speculative. "A court cannot order a spouse to invade her assets to meet her needs, . . . neither can it require [wife] to change the nature of these assets in order to produce income to meet her needs." *Schneider v. Nicholls*, No. C5-91-832, 1991 WL 245229, at *3 (Minn. App. Nov. 26, 1991).[5]

When they began this union, wife said, "I will stay at home for the good of our children and family," and husband said, "I'll take care of the money." The contribution of one spouse should not outweigh the contribution of the other when the goal is a balanced and well-functioning family.

---

[4] According to the Federal Reserve, the average 6-month CD was earning 7.01% in 1987, versus .27% in 2013. *See* http://www.federalreserve.gov/releases/h15/data.htm.
[5] I find this unpublished case to be persuasive. *See Dynamic Air*, 502 N.W.2d at 800.

Many might say, "What is the problem? Her share of a five-million dollar marital estate leaves her a millionaire." However, that ignores the reality that husband's share of the marital assets also leaves him a millionaire, while affording him all of the cash flow created by the combined efforts of this couple during the marriage. When asked how this could be fair during oral argument, husband's counsel suggested that his client's contribution by going to work every day was more valuable than wife's contribution as a stay-at-home parent. Recognizing that this was not a winning strategy, he quickly conceded that perhaps this was not the best answer. After all, the most precious assets cultivated and developed during this marriage were their children, who were by agreement primarily wife's responsibility. The children will provide both parties love, pride and happiness, not only now, but also into the future.

The favorable financial position that was built during the marriage was, by agreement, husband's responsibility. Yet, only the marital estate, which was fairly and equitably divided by agreement of the parties, is shared in the judgment. Every last cent of the ongoing $642,213 per year cash flow goes to husband, who told the district court he was willing and able to pay maintenance.[6]

---

[6] Although Minnesota has yet to recognize increased earning capacity as a marital asset, it is a relevant factor in determining a maintenance award. *See Davey v. Davey*, 415 N.W.2d 84, 88 (Minn. App. 1987); Minn. Stat. § 518.552, subd. 2(h) (2014) (describing "the contribution of a spouse as a homemaker or in furtherance of the other party's employment or business" as a relevant factor). This is especially pertinent to this case where it appears that husband's dental practice, a marital asset, was significantly undervalued by omitting the value of its intangible assets.

I might affirm the district court, deferring to its discretion, if at a minimum, it carefully considered the factors outlined in Minn. Stat. § 518.552, subd. 2, and awarded temporary maintenance to wife of at least $10,000 per month for 11 years, which is less than one-half the term of the marriage (this is the amount that husband was paying wife by agreement pending the maintenance decision). This would give her gross monthly income of approximately $14,313, or about $11,113 after federal and state taxes,[7] and allow her some ability to continue to grow her wealth, leave a legacy for her children, and, if she chooses, give back through charitable contributions. It would also protect her from a significant market downturn, since maintenance could be modified during this 11-year period.[8]

In contrast, after paying wife $10,000 per month, husband would still have approximately $29,000 in after-tax cash flow per month.[9] Since the district court indicated his claimed monthly expenses of approximately $10,900 were "artificially high," this is hardly unfair to him. More importantly, this would provide some fairness to wife and allow her to count on a more secure and comfortable retirement. Husband continues to easily enjoy the high standard of living established during the marriage, including his residence, the lake home, the vacation property, and the dental practice,

---

[7] Including investment income earning $35,674, assuming a 1.75% yield, and earned yearly income of $16,078.40 imputed by the district court, and maintenance.

[8] The district court failed to even retain jurisdiction over maintenance as suggested by the supreme court in *Lyon*, in case this court-created investment plan does not produce the income expected by the district court. 439 N.W.2d at 23.

[9] Notably, maintenance is tax deductible for the obligor. Husband's post-dissolution monthly after-tax cash flow is extrapolated from the 2012 federal and state tax returns. *See* 26 U.S.C. § 215 (2014). Husband's reduced income tax liability due to paying monthly maintenance of $10,000 would be approximately $4,945.

along with its furnishing, fixtures and equipment. He also has the ability to continue to invest at a high level. With $10,000 per month in maintenance, wife will have at least some of the trappings of their former marital lifestyle and a more secure financial future. Unlike many dissolution cases, there is sufficient income available here to allow both parties to maintain their very high standard of living. Even temporary maintenance of $10,000 per month for 11 years might seem unfair, since the record would support permanent maintenance in a much higher monthly amount.

The parties agreed that they fairly and equitably divided their marital assets, which were created during their 23-year marital partnership. But the cash flow of $642,213 a year was also a product of this supposedly equal marital partnership. Yet after 11 years, which is less than half of the length of the marriage, husband will receive over $7,000,000 from this cash flow while wife receives nothing. It is troubling that after giving up her opportunity to have a meaningful career, the district court suggests that wife should secure a full-time, minimum wage job in Sleepy Eye. This is in stark contrast to the affluent lifestyle that wife enjoyed during the 23-year marriage. Any parent familiar with the unpredictability of Minnesota law in recognizing the contributions of the stay-at-home parent and the sacrifices associated with surrendering a career should be hesitant in abandoning a career for the good of the family.

It was error to fail to fully appreciate the parties' high standard of living and to require wife to change the nature of the assets that she was awarded. This resolution

D-11

greatly devalues the contribution of an equal partner who stayed at home by agreement of

the parties.

Therefore, I would reverse and remand for a fair award of maintenance.[10]

---

[10] Because this opinion is unpublished, there will be continued uncertainty about a difficult and inconsistently applied area of the law. *Lyon*, which is over a quarter-century old, is the last precedent involving the question of whether to award maintenance in a high-asset, high-income dissolution. Moreover, in that opinion, Justice Simonett described the case as an "anomaly," due to the exceptionally large marital estate. *Id.* at 22. If the majority is correct in holding that a court may expect a party to change an investment asset, causing an immediate $154,527 loss in principal, in the hope that more earnings will be realized, this opinion should be published. I can find no precedent on point, and the majority's decision both directly opposes another unpublished opinion of this court, *Levinson v. Levinson*, No. C5-99-1772, 2000 WL 890443 (Minn. App. July 3, 2000), and is at odds with published caselaw referenced earlier in this dissent, making the holding of this case uncertain in application because the opinion is unpublished. In the future, attorneys may be reluctant, if not resistant, to enter into agreements that partially settle the parties' financial issues because of the unintended and unanticipated consequences to other outstanding issues in the case. This type of situation makes it difficult for an attorney to confidently advise a client.