*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1335, A14-1720**

In re the Marriage of:
Kerry S. Spolum, petitioner,
Respondent,

vs.

Michael J. D'Amato,
Appellant

**Filed August 17, 2015
Reversed and remanded
Worke, Judge**

Ramsey County District Court
File Nos. 62-FA-10-2756, 62-DA-FA-10-852

Nancy Zalusky Berg, Aure Schermerhorn-Snyder, Walling, Berg & Debele, P.A., Minneapolis, Minnesota (for respondent)

Kay Nord Hunt, Lommen Abdo, P.A., Minneapolis, Minnesota; and

Pamela L. Green, Golden Valley, Minnesota (for appellant)

Considered and decided by Cleary, Chief Judge; Hudson, Judge; and Worke, Judge.

UNPUBLISHED OPINION

**WORKE**, Judge

Appellant argues that the district court abused its discretion by awarding respondent permanent maintenance and in calculating the amount of maintenance and his income.  We agree and reverse and remand.

**FACTS**

Appellant Michael J. D'Amato and respondent Kerry S. Spolum married on September 15, 2001.  They have one son, born July 6, 2003.

Spolum was a flight attendant, earning approximately $46,000 annually.  Spolum took a leave to plan the wedding, and extended the leave following the 9/11 attacks.  Spolum returned to work after five years, but quit in 2006 because her commute was stressful.  D'Amato is an orthopedic surgeon employed at HealthPartners since 2005.

The parties separated in July 2010, and Spolum petitioned for legal separation.  Although the parties attempted reconciliation and suspended proceedings, they remained living apart.  When reconciliation failed, Spolum requested that the action be placed back on the active case calendar.  Trial began in August 2013.  At the time, Spolum was 49 years old and D'Amato was 45 years old.

Spolum testified that since the parties' separation she assumed that she would return to work, but wanted maintenance payments until their son reached 18.  Spolum was unsure about her career aspirations.  She is high-school educated with some college and art-school experience.  Spolum worked at a clothing boutique and as a yoga instructor.  She was interested in a sales position and a position with a chocolate

company, but nothing came of either. When the parties attempted reconciliation, Spolum sought to open a chocolate shop, but this endeavor was also not successful.

There was testimony that Spolum was "brilliant and creative" with party planning and that she had a talent for that kind of work. While Spolum agreed that she "would be a great party planner," she did not want that as a career because of the time commitment. Spolum is interested in animal-welfare advocacy and is on the board of directors for an animal-welfare organization. This interest led her to pursue educational courses, but she was released from the program for lack of undergraduate credits. Spolum testified that she hoped to establish a career as an animal-welfare advocate.

A vocational-rehabilitation consultant performed an assessment on Spolum and testified that without additional training, Spolum could work in a position earning between $10-12 an hour. She stated that Spolum could enroll in a two-year vocational program, which she could attend on a part-time basis or complete online.

Spolum testified that after D'Amato was let go from a physician practice, he was unable to secure employment in Minnesota. D'Amato applied to HealthPartners as a last resort; if he was not extended an offer, he would broaden his search out of state. Spolum testified that she invited the head of the HealthPartners group to their home to advocate reconsideration of the group's rejection of D'Amato, and D'Amato was offered a position following her efforts.

D'Amato testified that around 2004 or 2005, he began a second job as an independent medical-legal consultant at EvaluMed. D'Amato worked approximately 20 hours a week for EvaluMed. Near the end of 2011, D'Amato quit his second job for

3

several reasons, primarily because it was time consuming. It was also unhealthy and the stress and anxiety contributed to problems in the marriage. After leaving EvaluMed, D'Amato's health improved.

At HealthPartners, D'Amato works 50 hours a week on average, not including committees, meetings, and on-call duties. D'Amato testified to earnings of approximately $800,000 in 2013. He testified that he was seeing fewer patients due in part to patients being diverted to the new physicians who are building practices.

Denis McCarren, the director of orthopedics and neurosciences for HealthPartners, testified regarding HealthPartners' "production" compensation system. He explained that every year, each physician creates a draw—a standard amount paid every month. If a physician sets a draw and has a deficit at the end of the year, the physician has to pay the amount back. McCarren adjusts physicians' draws throughout the year to avoid deficits.

McCarren testified that the trend in healthcare has been a decrease in patient volume and surgical cases. He stated that D'Amato's schedules are not at capacity due to this trend. As a result, D'Amato's income has been less each year since 2011. McCarren predicted the continuance of this trend.

D'Amato testified that, based on discussions at HealthPartners, his projected salary for 2014 was approximately $750,000. But he proposed that for spousal-maintenance purposes, the district court use his income of $800,000 because that is what he would earn in 2013. D'Amato asserted that the trend would continue to decrease his yearly income, but because he had no proof, he believed $800,000 was reasonable.

4

D'Amato believed that he should pay spousal maintenance for four years to allow Spolum time to acquire employment or training.

The district court entered its original judgment and decree on December 9, 2013. D'Amato moved for amended findings, conclusions of law, and judgment and decree. In June 2014, the district court issued an amended judgment and decree.[1]

In its original judgment, the district court set D'Amato's income at $950,538. D'Amato argued that there was no evidence supporting this figure, rather, all of the evidence showed that his income is $800,000. But the district court did not modify D'Amato's income. The court, instead of relying on D'Amato's draw of $800,000, decided to average the last three years of D'Amato's earnings from HealthPartners. And, despite finding that D'Amato quit his second job "to create a more balanced life," the court stated that it would consider D'Amato's income from EvaluMed in the event the court overestimated D'Amato's income because D'Amato is "better positioned to correct the error by pursuing a myriad of options available to him and not to [Spolum]."

In its original judgment, the district court set Spolum's monthly discretionary spending at $9,943. D'Amato argued that the district court erred by giving Spolum a higher discretionary budget than she requested. The district court modified Spolum's discretionary spending to $8,343. It reached this figure by relying on D'Amato's submission of historic patterns in discretionary spending. In 2009, each party's monthly discretionary spending was $8,343. The court explained that "the marital standard of

---

[1] D'Amato sought review of the original judgment and decree and the amended judgment and decree (A14-1335); this appeal was stayed pending appellate family law mediation.

living is best reflected by allocating the highest level of discretionary spending for the period's history."

In its original judgment, the district court ordered D'Amato to pay Spolum $18,225 per month in permanent spousal maintenance. D'Amato argued that the district court made findings supporting Spolum's earning capacity and ability to reenter the workforce, but ignored those facts in ordering permanent maintenance.

The district court found that Spolum is "49 years old and in good physical and emotional health." The court was "impressed with [Spolum] during trial" and heard "no reason why she could not find a successful career" because she is "healthy, intelligent, articulate, creative, and capable." The district court found that Spolum is immediately employable in retail, but gave her one year to identify an employment plan and assigned incremental income goals. The district court stated that it "made findings regarding [Spolum's] ability to earn for purposes of assisting the parties and the court should there be future motions to modify maintenance or consider cost of living increases."

The permanent-spousal-maintenance award was based on: (1) the high marital standard of living, (2) the length of the marriage, (3) the fact that Spolum will never be able to support herself in a manner approximating the marital standard of living, and (4) the fact that D'Amato's income would not decrease. The district court noted that Spolum will receive approximately $1.2 million in marital assets, including the parties' Caribbean home, "Seacliff," and artwork valued at $110,000, but concluded that these

6

assets are unavailable to her until retirement. The district court ordered D'Amato to pay permanent maintenance in the amount of $14,072 per month.[2]

# D E C I S I O N

## *Permanent spousal maintenance*

D'Amato first argues that the district court abused its discretion in awarding Spolum permanent maintenance. We review a district court's spousal-maintenance award for an abuse of discretion, reversing if the district court's findings are unsupported by the record or if it misapplied the law. *Dobrin v. Dobrin*, 569 N.W.2d 199, 202 (Minn. 1997).

"Findings of fact concerning spousal maintenance must be upheld unless they are clearly erroneous." *Gessner v. Gessner*, 487 N.W.2d 921, 923 (Minn. App. 1992). A finding of fact is clearly erroneous when it is "against logic and the facts on record." *Putz v. Putz*, 645 N.W.2d 343, 347 (Minn. 2002); *Kampf v. Kampf*, 732 N.W.2d 630, 633 (Minn. App. 2007) (stating that "[f]indings of fact are clearly erroneous when they are manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole") (quotation omitted)), *review denied* (Minn. Aug. 21, 2007); *Vangsness v. Vangsness*, 607 N.W.2d 468, 472 (Minn. App. 2000) (stating that a finding is clearly erroneous if this court is "left with the definite and firm conviction that a mistake has been made") (quotation omitted)). This court reviews questions of law

---

[2] D'Amato appealed the second amended judgment and decree entered on August 6, 2014 (A14-1720). The two appeals were consolidated for judicial economy.

7

related to spousal maintenance de novo. *Melius v. Melius*, 765 N.W.2d 411, 414 (Minn. App. 2009).

A district court may award spousal maintenance if the requesting spouse (1) lacks sufficient property, including allocated marital property, to provide for reasonable needs considering the marital standard of living or (2) is unable to provide self-support through appropriate employment, in light of the marital standard of living. Minn. Stat. § 518.552, subd. 1 (2014). In determining an appropriate spousal-maintenance award, a district court must consider relevant factors resulting in a "just" award. *Id.*, subd. 2 (2014). Factors include the (1) financial resources of the requesting party, including marital property apportioned to that party, and the party's ability to meet needs independently; (2) time necessary to become self-supporting; (3) marital standard of living; (4) duration of the marriage; (5) loss of employment benefits and opportunities foregone by the requesting party; (6) age, physical condition, and emotional condition of the requesting party; (7) ability of the obligor to meet the needs of both parties; and (8) contribution of each party in the acquisition, preservation, and depreciation of marital property. *Id.*

D'Amato asserts that an analysis of these factors does not support an award of permanent maintenance because the district court placed an "overriding emphasis" on the marital standard of living, which is merely one factor.

### *Financial resources*

The district court found that Spolum worked minimally since 2006, and concluded that she, therefore, has "few independent sources of income." But the district court also found that Spolum was awarded approximately $1.2 million in marital assets as part of

8

the property division. While the district court found that the "bulk of these assets will be unavailable to her until retirement and cannot support her monthly needs," this finding is unsupported by the record.

Only $288,913 of Spolum's award is in the form of retirement assets. Spolum was awarded Seacliff valued at over $1 million, based on her request despite D'Amato's proposal to sell the property, and artwork valued at $110,000. She is also entitled to an equal share of the profits from the sale of the marital home. Additionally, Spolum receives rental payments from Seacliff. She testified that she takes as many rentals as possible and uses the property for personal use only 70 days a year. None of these assets are available only upon retirement, and all may be sold at Spolum's discretion. The district court found as much, stating, "[u]ltimately, it will be up to [Spolum] to decide whether the expense of [Seacliff] will continue to make financial sense for her." The district court's finding regarding Spolum's financial resources is clearly erroneous.

### *Time necessary to become self-supporting*

The district court found that Spolum is immediately employable in retail. The district court acknowledged that Spolum is "healthy, intelligent, articulate, creative and capable," and found "no reason why she could not find a successful career." The district court gave Spolum one year to identify a plan and assigned potential income to her, but provided no means to review Spolum's progress, and stated that it "made findings regarding [Spolum's] ability to earn for purposes of assisting the parties and the court should there be future motions to modify maintenance or consider cost of living increases." The record supports the district court's findings that Spolum is immediately

employable and that there is no reason why she cannot find a successful career. But the district court abused its discretion by assigning potential income to Spolum, but failing to provide for review of her progress.

The district court's findings support an order for rehabilitative maintenance, not permanent maintenance. For example, in *Hall v. Hall*, this court concluded that the district court did not abuse its discretion by awarding rehabilitative maintenance when the wife was 39 years old at the time of the dissolution; had been married 18 years; had a high-school education but desired to obtain a four-year degree; had worked sporadically during the marriage; and received a car, half of her spouse's pension, and a half interest in the homestead in the property distribution. 417 N.W.2d 300, 301, 303 (Minn. App. 1988). Similarly, Spolum is high-school educated; worked part-time jobs during the marriage; desires a career, albeit she is uncertain of her employment future; and received substantial marital assets.

### *Marital standard of living*

The district court found that the parties enjoyed a high marital standard of living. "The purpose of a maintenance award is to allow the recipient and the obligor to have a standard of living that approximates the marital standard of living, as closely as is equitable under the circumstances." *Peterka v. Peterka*, 675 N.W.2d 353, 358 (Minn. App. 2004).

In *Chamberlain v. Chamberlain*, this court concluded that the district court properly considered "the long-standing affluent lifestyle of the parties" in affirming the permanent-maintenance award. 615 N.W.2d 405, 412 (Minn. App. 2000), *review denied*

(Minn. Oct. 25, 2000). But in *Chamberlain*, while the district court considered the marital standard of living, it determined that the parties' standard of living was beyond their means and reduced some of the wife's claimed expenses and considered "the marital standard of living that would have been within the parties' means." *Id.* at 410. The district court stated that the wife needed "spousal maintenance in order [to] duplicate a standard of living that . . . *represents a substantial reduction from the standard of living born of deficit spending*." *Id.* (emphasis added.) This court stated that while the district court did not abuse its discretion in awarding permanent maintenance to the wife who was 50 years old and had been in a 20-year marriage, that a different result was supportable and that it might have reached a different result. *Id.* at 407, 412.

Here, Spolum agreed that the marital standard of living was "excessive and unnecessary" and was a "mistake." Unlike the district court in *Chamberlain*, the district court here did not consider the parties' marital standard of living within their means, nor were the parties in a 20-year marriage. Additionally, unlike Spolum, the wife in *Chamberlain* contributed to the parties' combined wealth through her own career. *Id.* at 407.

Further, as D'Amato points out, the district court considered the standard of living over the course of the marriage when D'Amato worked two jobs. The district court found that D'Amato quit the second job in order to create a "more balanced life," and this finding is supported by the record. It seems unreasonable, then, for the district court to consider a lifestyle that included income from a second job that contributed an average of approximately $200,000 per year.

11

### *Duration of the marriage*

The district court found that the parties were married 12 years. But Spolum petitioned for legal separation in October 2010; thus, the parties lived together as husband and wife for nine years. In *Perlstein v. Perlstein*, the district court awarded the wife permanent maintenance following dissolution of a nine-year marriage. 356 N.W.2d 383, 384 (Minn. App. 1984). But in that case, the wife was 61 years old, had been unemployed for more than 30 years, had no employable skills, had an eleventh-grade education, and suffered from medical disabilities. *Id.* Here, the duration of the marriage and the circumstances of the parties support an award of temporary maintenance.

### *Loss of employment benefits and opportunities*

The district court found that Spolum "acquired minimal retirement assets in her name alone. The loss of earnings, earning potential, seniority, and retirement benefits are substantial." The court then found that Spolum had "acquired approximately $1 million in retirement, real estate and investment assets."

The record shows that Spolum initially went on leave from her position as a flight attendant in order to plan the parties' wedding. Prior to the wedding, Spolum earned approximately $46,000 annually. She owned no property and had very little retirement savings. She was awarded her pension during asset allocation—it is listed as "[n]ot valued." Other than leaving a position in which she earned $46,000 annually, there is no evidence in the record that Spolum's loss is "substantial."

*Age, physical condition, and emotional condition*

The district court found that Spolum is 49 years old and in good health. At most, this finding supports an award of rehabilitative maintenance. *See Maiers v. Maiers*, 775 N.W.2d 666, 669 (Minn. App. 2009) (affirming award of temporary maintenance when the receiving spouse, a trained and experienced flight attendant, could obtain additional training hours as a flight attendant, and was "capable of obtaining additional vocational training in order to become self-sufficient").

*Obligor's ability to meet the needs of both parties*

D'Amato does not dispute Spolum's need for temporary maintenance or that he has the ability to pay her maintenance.

*Contribution in acquisition, preservation, and depreciation of marital property*

The district court found that D'Amato worked long hours and that Spolum primarily cared for the parties' son. The district court found that Spolum "persuaded HealthPartners to hire [D'Amato]," after she took the "extraordinary step of inviting the person responsible for the hiring decision into their home." While Spolum testified that she invited the head of the HealthPartners group to their home to advocate D'Amato's hiring, she also testified that D'Amato was prepared to pursue a career out of state if not hired by HealthPartners. Thus, Spolum's efforts in assisting D'Amato in securing employment was done to keep the family in Minnesota; it seems that D'Amato would have been amenable to relocating—he worked in New York and Ohio before Minnesota. Moreover, even if Spolum assisted in D'Amato's hiring, he maintained employment with

13

HealthPartners for several years. Thus, the district court credited Spolum for D'Amato's employment, but failed to recognize that D'Amato maintained that employment.

Additionally, the district court failed to consider Spolum's dubious use of assets. When Spolum filed for legal separation, she transferred $125,000 from the parties' joint account into her own account. A court order required Spolum to "retain intact the $125,000," but she failed to do so, reducing the balance to a little over $40,000. The district court declined to conclude that Spolum violated her fiduciary duty to preserve this marital asset, finding that she used the money to start the chocolate shop and in her position on the charitable board, which is "part of her marketability" for a possible career.

Spolum admitted that after signing the agreement to keep the funds intact, she used approximately $85,000—she paid her required contribution to charitable organizations, she paid her business partner in the chocolate shop, and she paid approximately $25,000 in legal fees. The record shows that Spolum failed to preserve this marital asset.

First, Spolum violated a court order. Second, Spolum being on a board for a charitable organization is not essential to her marketability because her interest in a career in animal-welfare advocacy requires higher education for which she lacks undergraduate credits. Her position on a board is not a substitute for her lack of education. Third, Spolum used funds to pay her legal fees for the dissolution. Finally, Spolum testified that she intended to pay this "loan" back. The record does not support the district court finding that Spolum had no duty to preserve this marital asset.

14

Applying the evidence to the relevant factors, the district court clearly erred in several findings supporting its conclusion that Spolum is entitled to permanent spousal maintenance and abused its discretion in awarding Spolum permanent spousal maintenance.

### *Maintenance amount*

D'Amato argues that the district court abused its discretion in ordering him to pay $14,072 per month in spousal maintenance, specifically challenging the district court's findings regarding Spolum's discretionary spending. While factual findings regarding monthly expenses in a spousal-maintenance calculation "must be upheld unless clearly erroneous," *McCulloch v. McCulloch*, 435 N.W.2d 564, 566 (Minn. App. 1989), "[a] [district] court's calculation of living expenses must be supported by the evidence." *Rask v. Rask*, 445 N.W.2d 849, 854 (Minn. App. 1989).

"Because maintenance is awarded to meet need, maintenance depends on a showing of need." *Lyon v. Lyon*, 439 N.W.2d 18, 22 (Minn. 1989); *see also Lee v. Lee*, 775 N.W.2d 631, 642 (Minn. 2009) (stating that the district court awarded wife more maintenance than she reasonably needed to support herself and instructing the district court on remand to make findings that support the current award or a different award).

The district court set Spolum's discretionary spending at $8,343 because the "marital standard of living is best reflected by allocating the highest level of discretionary

15

spending for the period's history." D'Amato argues that $8,343 exceeds the amount Spolum requested based on her need, which is approximately $6,000[3] a month.

The record does not support the district court's decision to use a discretionary spending figure of $8,343 from 2009. First, the amount is in excess of what Spolum needs. Second, the district court stated that it chose this amount from 2009 because it "best reflected" the marital standard of living, but Spolum admitted that the marital standard of living was "excessive," "unnecessary," and a "mistake."

Third, the district court chose this amount to reflect the marital standard of living, yet accepted D'Amato's proposed budget for himself. The district court assigned $8,343 in discretionary spending to Spolum and not D'Amato, despite the fact that his discretionary spending in 2009 was also $8,343. D'Amato proposed that his discretionary spending was approximately $5,350. The court accepted this budget because it was "not disputed by the parties." However, Spolum did challenge D'Amato's budget for travel and food, believing that the numbers were too low.

Fourth, in 2009, the couple was spending money together, including funding their "lavish" and "extravagant" parties and fundraisers, and paying for expensive dinners out with friends and neighbors. Spolum testified that the couple enjoyed "hosting great part[ies]" together and that this was one thing that drew them together. The couples'

---

[3] Spolum's monthly discretionary-spending budget included: food ($2,047.83), clothing/shoes ($301.47), laundry ($3.55), transportation ($1,000.08), car insurance ($134.13), entertainment ($92.18), vacations ($658.50), printed material ($8.26), personal allowances ($248.33), pet expenses ($352.73), gifts ($241.22), charitable contributions ($768.66), cell phone ($113.47), and cash withdrawals ($50.45), which totals approximately $6,020.

spending also included family vacations.  Spolum testified that they would take great family vacations and that their love for travel was a commonality and something that brought them together.  There is no evidence that either party held lavish affairs after their separation, treated their friends and neighbors to expensive dinners, or continued family vacations.

Fifth, D'Amato's income in 2009 was greater than in 2013.  D'Amato was working at EvaluMed, which contributed $230,000 to his income.  His income in 2009 was $1,280,904 and his income for 2013 was $800,000.  His income in 2009 was approximately $330,000 greater than the $950,538 income that the district court assigned D'Amato.  With a higher income comes the benefit of increased discretionary spending.  The district court abused its discretion in setting Spolum's discretionary spending.

D'Amato also challenges the district court's award to Spolum of $167 per month for additional travel when travel is included in discretionary spending and because the $167 is for housing while she is in the Caribbean.  There is no support in the record for this allocation.  Spolum does not need an allocation for housing when she owns a home in the Caribbean.

*Income*

Finally, D'Amato argues that the district court clearly erred in determining that his annual income is $950,838.  The district court averaged D'Amato's income from HealthPartners for the last three years (2010-12) because it provided the best estimate of his earning capacity.  D'Amato argues that the record shows that his income in 2013 is $800,000.  "A district court's determination of income for maintenance purposes is a

17

finding of fact and is not set aside unless clearly erroneous." *Peterka*, 675 N.W.2d at 357. A "maintenance obligation should [be] calculated based upon [the obligor's] income at the time of trial." *Carrick v. Carrick*, 560 N.W.2d 407, 412 (Minn. App. 1997).

The district court declined to consider D'Amato's income in 2013, despite the fact that the record shows that D'Amato's draw for 2013 was $800,000 and D'Amato testified that he was on track to make approximately $800,000 in 2013. D'Amato submitted paystubs for 2013 that showed his gross pay for a two-week period was $30,995, which results in annual income of $805,870. The district court found that "two paystubs show gross pay of $30,995 for a two-week period. This amount times 26 pay periods results in annual income of $805,870 which is consistent with [D'Amato's] annual draw." But the district court also found that the year-to-date gross pay on the paystubs ($517,591) showed that D'Amato was "on pace to earn $1,000,000." The district court decided to do an average of income figures from 2010-12 because it was "unable to reconcile the difference in annual income calculations." But there is approximately $64,000 in bonus payments from previous years included in the year-to-date figure. D'Amato explained that it was "money on the production [he] had from the previous year."

Additionally, the record shows that D'Amato's income was declining, which was not due to anything he did. D'Amato saw fewer patients due in part to patients being diverted to new physicians who were building their practices. His schedules were not at capacity due to the downward trend in patient volume and surgical cases. McCarren stated that D'Amato's income has been less each year since 2011, and predicted continuation of the trend.

18

Finally, the district court determined that if it overstated D'Amato's income, D'Amato was in a better positon "to correct the error by pursuing a myriad of options available to him and not to [Spolum]." This would likely require D'Amato to go back to consulting work with EvaluMed or the like. But D'Amato is already working approximately 50 hours a week at HealthPartners, not including committees, meetings, and on-call duties. And the district court found credible that D'Amato quit his second job in order to have a more balanced life. It seems unreasonable for the district court to require D'Amato to work a second job in order to satisfy a maintenance award when Spolum is not required to work even one job to attain self-support. Because the record does not support the district court's calculation of D'Amato's income at $950,538,[4] the district court abused its discretion.

We reverse and remand to the district court to recalculate Spolum's discretionary spending and D'Amato's income in a manner consistent with this opinion. We also reverse the district court's award of permanent spousal maintenance, and remand for a determination of the appropriate level of maintenance in conformity with this opinion. The district court, in its discretion, may reopen the record if doing so assists in determining the amount and duration of the maintenance award.

**Reversed and remanded.**

---

[4] If the district court decided to average income figures, it would have been more appropriate to have had averaged the current year (2013) and the last two years, resulting in an average income of $892,548.

19